United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 31, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

NO. 02-60385

_____

JOHN B. NIXON, SR., also known as John B. Nixon, Jr.,

Petitioner-Appellant,

versus

CHRISTOPHER B. EPPS, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Mississippi

_____

Before JONES, SMITH, and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This habeas appeal arises out of the January 1985 murder for hire of Virginia Tucker. John B. Nixon, Sr. was convicted of capital murder by a Rankin County, Mississippi, jury after a three-day trial. In the penalty phase of the trial the jury returned a death penalty verdict, finding that the capital offense was committed for pecuniary gain, that the murder was especially heinous, atrocious and cruel, and that the defendant had previously been convicted of a felony involving the use or threat of violence to a person. The conviction was affirmed on direct appeal by the Mississippi Supreme Court. Nixon v. State, 533 So. 2d 1078 (Miss. 1987). Certiorari was denied by the United States Supreme Court in

1989. <u>Nixon v. Mississippi</u>, 492 U.S. 932, 110 S. Ct. 13 (1989). Nixon exhausted his state post-conviction remedies. <u>Nixon v. State</u>, 641 So. 2d 751 (Miss. 1994), <u>cert. denied</u>, <u>Nixon v. Mississippi</u>, 513 U.S. 1120, 115 S. Ct. 922 (1995). Nixon then filed a federal petition for a writ of habeas corpus. The district court, in a series of three decisions between 1998 and 2002, denied habeas relief. The case first came to this court on appeal from the district court's grant of a certificate of appealability (COA) on Nixon's claim of ineffective assistance of counsel and on Nixon's motion to this court for a COA on ten other grounds. In a previous, unpublished opinion, we denied COA on eight of the grounds requested by Nixon but granted a COA on Nixon's <u>Batson</u>/<u>Powers</u> claim and his claim regarding the introduction of a prior statutory rape conviction as an aggravator.[1] After reviewing the record and briefs on the additional COA-granted issues, we now AFFIRM.

## I. BACKGROUND

On January 22, 1985, Nixon and two other individuals arrived at the home of Thomas and Virginia Tucker. Upon entering the house, Nixon pulled out a .22 caliber pistol and said, "I brought y'all something." Thomas Tucker, who had married his wife six months earlier (a scant three months after her divorce was finalized), immediately surmised that the men had been hired by his

_____

[1] We denied relief on the <u>Batson</u>/<u>Powers</u> claim in the earlier opinion, and requested additional briefing on the two issues addressed here.

wife's former husband, Elster Joseph Ponthieux. Mr. Tucker offered Nixon money to spare their lives, but Nixon replied, "[t]hat's not what I'm after. The deal's already been made." Nixon and one of his associates then shot at Thomas Tucker, who managed to escape despite being hit in the side. Mr. Tucker made his way to his nearby place of work and asked a co-worker to check on his wife. Meanwhile, Nixon took the gun back from his associate, held the gun one inch behind Virginia Tucker's ear and fired a shot into her head. Nixon and his associates fled. Mrs. Tucker was soon discovered by Tucker's co-worker and was taken to the hospital, where she died the next day. Nixon was arrested after being identified in a lineup by Thomas Tucker.

At trial, as noted above, Nixon was convicted of capital murder and sentenced to death. Following completion of his direct appeal and state post-conviction proceedings, Nixon filed a federal habeas petition that was denied by the district court. His appeal to this court followed.

## II. DISCUSSION

This opinion addresses two issues raised by Nixon on which COA has been granted: his ineffective assistance claim, and his claim regarding the introduction of a prior violent felony conviction before the jury as an aggravator. We first set forth the applicable standards of review and then turn to these two issues.

3

## A. Standard of Review

Because Nixon's original federal habeas petition was filed in 1995, before the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), pre-AEDPA standards apply to the district court's review of the petition as well as to appellate review. See Lindh v. Murphy, 521 U.S. 320, 326-27, 117 S. Ct. 2059, 2063 (1997); see also Slack v. McDaniel, 529 U.S. 473, 481, 120 S. Ct. 1595, 1602 (2000) (noting that "Lindh requires a court of appeals to apply pre-AEDPA law in reviewing the trial court's ruling, for cases commenced there pre-AEDPA"). In evaluating the district court's resolution on the merits of issues presented to it, we review the district court's findings of fact for clear error and its conclusions of law de novo. Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001). We review its determination of a procedural bar de novo. Johnson v. Puckett, 176 F.3d 809, 814 (5th Cir. 1999).

## B. Ineffective Assistance of Counsel Claim

Nixon first contends he received ineffective assistance of counsel in violation of Strickland v. Washington, 466 U.S. 668, 108 S. Ct. 2052 (1984), at both the guilt/innocence and sentencing phases of his trial.

In Nixon's state post-conviction application, the Mississippi Supreme Court held his ineffective assistance claim

procedurally barred based on MISS. CODE. ANN. § 99-39-21.[2]  See

Nixon, 641 So. 2d at 756.  Under Mississippi law, as it existed at

the time of Nixon's trial, a petitioner waives his ineffective

assistance claim when he uses different counsel on direct appeal

and fails to raise the ineffective assistance claim on direct

review.  Evans v. State, 485 So. 2d 276, 280-81 (Miss. 1986);

Lockett v. State, 614 So. 2d 888 (Miss. 1992); see also Sones v.

Hargett, 61 F.3d 410, 416 n.9 (5th Cir. 1995).  As Nixon employed

different counsel on direct appeal, his failure to raise this issue

at that time constituted procedural default.  A procedural default

represents an "adequate and independent" state ground, which

precludes reconsideration of the issue unless the petitioner can

demonstrate cause and prejudice, or that failure to consider the

claims will result in a "fundamental miscarriage of justice."

Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565

(1990).  The district court initially agreed with the state habeas

court's procedural default determination.

In his brief in this court, Nixon has not attempted to

overcome the procedural bar by demonstrating cause and prejudice or

that failure to consider his ineffective assistance claim will

---

[2]     MISS. CODE ANN. § 99-39-21 (SUPP. 1993) provides in part that "failure
by a prisoner to raise objections, defenses, claims, questions, issues or errors
either in fact or law which were capable of determination at trial and/or on
direct appeal, regardless of whether such are based on the laws and the
Constitution of the State of Mississippi or of the United States, shall
constitute a waiver thereof and shall be procedurally barred . . . ."   The
procedural law also states that the doctrine of res judicata "shall apply to all
issues, both factual and legal, decided at trial or [on] direct appeal."

5

result in a fundamental miscarriage of justice.[3] Any such argument is now considered waived. FED. R. APP. P. 28(a)(9)(A) & (B); <u>Foster v. Townsley</u>, 243 F.3d 210, 212 n.1 (5th Cir. 2001) (issues inadequately briefed are deemed waived). The fact that the district court later held an evidentiary hearing, resolved the ineffective counsel claims against Nixon, and granted a COA on this issue in no way resolves the procedural bar in Nixon's favor.[4] <u>See</u> <u>Soffar v. Dretke</u>, 391 F.3d 703, 703-04 (5th Cir. 2004) (clarifying on rehearing that a court's decision to grant COA on an issue neither precludes consideration of a procedural default nor resolves any questions concerning procedural default in the petitioner's favor). We thus affirm the district court on the basis of Nixon's procedural default. <u>See, e.g.</u>, <u>Foreman v. Babcock & Wilcox Co.</u>, 117 F.3d 800, 804 (5th Cir. 1997) (court of appeals can affirm the district court based on any ground raised in the district court and supported by the record).

Nevertheless, the district court went on to assess the merits of (and ultimately to reject) Nixon's ineffective assistance claim. Even if, like the district court, we considered Nixon's

---

[3] Notably, Nixon did not attempt to argue that he met the cause and prejudice requirements in the district court either. In the district court, Nixon argued only that the procedural bar did not apply to him, and did not even raise the cause and prejudice argument in the alternative.

[4] The state has not challenged, and we do not review, whether the district court's decision to hold an evidentiary hearing on Nixon's claims comported with pre-AEDPA requirements for holding an evidentiary hearing on collateral review. <u>See</u> <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1, 11, 112 S. Ct. 1715, 1721 (1992).

ineffective assistance claim on the merits, we would nonetheless affirm the district court. "[T]he ultimate question of effective assistance of counsel is a mixed question of law and fact" reviewed de novo by this court, see Lockett, 230 F.3d at 699, but we afford a presumption of correctness to all district court factual findings if they are supported by the record. Id. at 710-11.

Nixon asserts that he received ineffective assistance of counsel in violation of Strickland v. Washington, 466 U.S. 668, 108 S. Ct. 2052 (1984), at both the guilt/innocence and sentencing phases of his trial. To prevail, he has the burden to demonstrate both "deficient performance" and "prejudice." Belyeu v. Scott, 67 F.3d 535 (5th Cir. 1995). The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S. Ct. at 2065. If this first hurdle is cleared, the defendant then has the burden to show that because of counsel's deficient performance "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceeding. Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990); Loyd v. Smith, 899 F.2d 1416, 1426 (5th Cir. 1990).

Nixon alleges three grounds of ineffective assistance during the guilt/innocence phase: (1) failure to adjust trial

7

strategy based upon the state's evidence that the crime was committed for pecuniary gain, including testimony by Tommy Tucker; (2) failure to protect Nixon's Sixth Amendment rights during voir dire by failing to object to the state's use of peremptory challenges; and (3) failure to interview a prospective witness, Wade Carpenter, who testified that he sold Nixon the murder weapon.

Nixon's specific allegations of deficient performance are unpersuasive. The theory of Nixon's trial counsel was that the state's evidence was insufficient to convict their client of murder for hire. When Virginia's husband Thomas Tucker testified that Nixon told them "the deal's already been made," Nixon's attorneys were surprised. They objected and argued to the trial court that the government improperly withheld this evidence. The trial court overruled the objection, leaving defense counsel to attack this testimony — and corroborating testimony by accomplice Jimenez — through cross-examination. The jury made the ultimate credibility determination on this issue. That the jury disagreed with Nixon's counsel as to who was being truthful in no way demonstrates the inadequacy of counsel's attempt to persuade them otherwise.

Nixon's other claims of ineffective assistance during the guilt/innocence phase warrant less attention. The claim that counsel were deficient in failing to object to the prosecution's alleged racial use of peremptory strikes during voir dire must fail because Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364 (1991), had not been decided at the time of Nixon's trial. Even so, Nixon

8

raised (and lost) this claim on direct review, so even assuming deficient performance, Nixon suffered no prejudice through counsel's failure to object.[5] As to Nixon's claim regarding counsel's failure to interview Wade Carpenter, we agree with the district court's appraisal of the claim: Presentation of testimonial evidence is a matter of trial strategy, and, particularly on federal habeas review, claims concerning what a witness might have testified if called at trial are largely speculative. See McCoy v. Cabana, 794 F.2d 177, 183 (5th Cir. 1986); Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978). In any event, we repeat the observation in our COA opinion that Nixon's identification as the culprit, which counsel might have undermined in questioning Carpenter, "was not a significant issue at trial." COA Op. at 15. Nixon failed to demonstrate deficient performance on his ineffective assistance claim regarding the guilt/innocence phase.

Additionally, Nixon asserts four areas of deficient performance on the part of counsel during the sentencing phase: (1) failure to investigate and present mitigation evidence; (2) presenting an unprofessional and prejudicial closing argument; (3) failure to research the facts or law regarding an aggravating

---

[5] Further, even if Powers had been the law at the time of his trial, the Mississippi Supreme Court has held, and this court has agreed, that Powers is not a new rule of law that may be applied retroactively. COA Op. at 8-11.

9

circumstance; and (4) failure to object to the state's statements made during sentencing.

Nixon now presents several incidents that could have supported mitigation: In 1966, he risked his own life to pull a woman from the burning wreckage of a plane crash; he once rescued a drowning boy from a flooded irrigation ditch; he volunteered to serve in both the Army and Navy and received honorable discharges from each service; he left the Army at his mother's request because his father abandoned his mother and sisters; he left school in seventh grade, but ultimately earned a GED in prison, and learned a trade, which he taught other prisoners; he suffered child abuse; and he struggled throughout life with alcohol abuse and "a severe personality disorder." Pet'r's Merits Br. at 6-7. Nearly all of this mitigating evidence was discovered through the course of habeas litigation.

During trial and sentencing, Nixon was of little or no help to his counsel; in fact, counsel had to convince Nixon's sisters to testify on his behalf. This court has held that "a defendant who does not provide any indication to his attorneys of the availability of mitigating evidence may not later assert an ineffective assistance claim." Wiley v. Puckett, 969 F.2d 86, 99-100 (5th Cir. 1992).[6] However, that does not mean trial counsel

---

[6] See also Burger v. Kemp, 483 U.S. 776, 794-95, 107 S. Ct. 3114, 3126 (1987) (finding reasonable defense counsel's choice to interview only those witnesses called to his attention by the defendant); James v. Butler, 827 F.2d 1006 (5th Cir. 1987) (rejecting ineffective assistance claim when petitioner

10

did no independent investigation whatsoever.  In fact, Nixon told his lawyers that he did not want the mitigation evidence they did possess — that Nixon had saved a woman from a plane crash — presented on his behalf.[7]  At the federal evidentiary hearing, the district court determined that Nixon was not "acting emotionally and irrationally" to such a degree that his attorneys ethically had to disregard his objection to presenting this evidence.  There is no basis to disregard this finding.  See also Amos v. Scott, 61 F.3d 333, 348-49 (5th Cir. 1995) (rejecting ineffective assistance claims when the defendant objected to his counsel's desire to call certain witnesses on his behalf during sentencing).  Precedent also prohibits a Janus-like defense strategy:  A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense.  See Roberts v. Dretke, 356 F.3d 632, 638 (5th Cir. 2004); Dowthitt v. Johnson, 230 F.2d 733, 748-49 (5th Cir. 2000).

The district court explored many of Nixon's mitigation claims at the evidentiary hearing.  Nixon's claim that he was subject to child abuse was rejected by the district court, which instead found only that Nixon received "strict discipline."  194 F.

---

failed to alert counsel to the possibility of a defense based on mental impairment due to drugs).

[7]    Nixon's lawyers learned of this story not from Nixon, but through their own, independent pretrial investigation.

11

Supp. 2d at 510. Similarly, Nixon's claim that his parents were alcoholics was not corroborated. Nixon's sister did testify that she became aware of her mother's drinking problem in 1957, when Nixon was almost 30 years old. This in no way supports Nixon's contention that he was raised by abusive, alcoholic parents. Further, Nixon's sister could not vouch for his claim that he drank heavily as a child. Finally, Dr. Doyle Smith, who testified about Nixon's adult alcoholism, was ultimately deemed of "little value" by the district court (id.), largely because Dr. Smith could not testify whether alcoholism played any role in Nixon's committing the crime, and Dr. Smith had a very different picture of Nixon's childhood than that offered by Nixon's own family members. The presumption of correctness shields these findings of fact beyond Nixon's criticisms.

Nixon's claim that his lawyers "prepared no mitigation case" is belied by trial counsel's pretrial investigation and pretrial request for a psychological expert. During the punishment phase, however, Nixon's attorneys chose to plead for his life rather than offer flimsy "mitigating" evidence. As a strategic decision, this was not unreasonable. To fault Nixon's counsel for failing to call additional witnesses during sentencing would be engaging in second-guessing of strategic decisions, which, as already discussed, we are loath to do. See McCoy v. Cabana, supra; Martin v. McCotter, 796 F.2d 816, 817 (5th Cir. 1986). Further, this claim ignores the dearth of options trial counsel had at their

12

disposal: Both of Nixon's sons were willing to testify <u>against</u> him at trial and maintained this preference on habeas. None of Nixon's children were willing to testify on his behalf either at trial or at the federal evidentiary hearing. One of the witnesses called at the federal evidentiary hearing, but not called at trial, was one of his sisters, Mary Walden. Although she corroborated little of Nixon's alleged mitigating evidence, she had knowledge of a key fact that would have devastated her testimony at trial: Nixon raped his stepdaughter. Given Nixon's lack of cooperation and a severe shortage of "humanizing" evidence, trial counsel were not ineffective for foregoing the attempt to offer mitigating evidence.

Nixon amplifies his ineffective assistance claim concerning mitigation evidence by analogizing his case with <u>Lockett v. Anderson</u>. In <u>Lockett</u>, this court granted habeas relief based in part on trial counsel's failure to investigate and discover evidence of a major personality disorder (and additional symptoms of paranoid schizophrenia), brain abnormality, and the defendant's lengthy, documented history of seizures. 230 F.3d at 713.[8] Lockett's counsel also represented Nixon at trial. Indeed, the

---

[8] The district court may have reconsidered its procedural bar determination based in part on this court's holding in <u>Lockett</u>. In that case, however, the portion of the district court's determination that rested on a procedural bar was indeed affirmed. <u>See</u> <u>Lockett</u>, 230 F.3d at 709-10. Furthermore, because we review de novo all procedural bar determinations, to the extent that the district court's later, amended opinions can be read to resolve the procedural bar issue in Nixon's favor, we reject those implied determinations and thus affirm the district court on alternative grounds. As discussed in our COA determination and numerous cases in this court and the Supreme Court of the United States, we cannot engage in constitutional second-guessing of state courts where adequate and independent state grounds are dispositive of a claim of error.

13

trials occurred virtually back-to-back, and counsel testified that his inability adequately to prepare Lockett's mitigation evidence was due in part to his simultaneous work on Nixon's case. Id. at 711. That the consequence for Lockett was ineffective counsel in the penalty phase does not, of course, mandate the same conclusion in Nixon's quite different situation.

At Nixon's evidentiary hearing, Dr. Gerald O'Brien admitted on cross-examination that Nixon's purported personality disorder would "probably not" have caused him to commit the crime or prevented him from knowing the difference between right and wrong. By contrast, Lockett's experts specifically linked his temporal lobe epilepsy, which was evident in his confessions and through a long paper trail of prior medical problems, to Lockett's crime. Two different experts stated explicitly that they did not believe Lockett would have committed his crimes if he did not have severe mental problems. Id. at 713-14. Even assuming Nixon's personality disorder claim had been uncovered by counsel and believed by the jury, Dr. O'Brien's testimony does not rise to the level of the experts used in Lockett. Specifically, Nixon's own expert would not corroborate his claim that any purported mental or personality problem interfered with Nixon's willingness or ability

14

to commit the crime. Nixon's attempt to hold his counsel liable because counsel fell short in <u>Lockett</u> is unavailing.[9]

Nixon's claim concerning his counsel's closing argument at sentencing also fails. Counsel's simple, sincere request for sympathy and appeal to the jury's sense of religious compassion was in keeping with counsel's strategic decision to plead for their client's life rather than attempt to re-argue the facts of the case they had just lost. As already mentioned, this strategy, while ultimately unsuccessful, was a reasonable choice given the facts of the case and the age of their client. Similarly, when defense counsel mentioned other "heinous, cruel atrocious crimes" during closing argument, this rhetoric was in keeping with the strategic decision to plead for Nixon's life.[10] Contrary to Nixon's claim that this argument "all but invited a death sentence" (Pet'r's Merits Br. at 35), defense counsel was merely acknowledging the

---

[9]    <u>Lockett</u> is also inapposite to Nixon's other penalty phase evidence because, as noted above, Nixon could have but did not inform his trial counsel of the evidence about his prior good deeds that might have been introduced.

[10]    In a similar case, where defense counsel gave an extremely brief closing argument and never mentioned any mitigating evidence, we observed the following:

> Given his difficult situation, we are not prepared to fault [trial counsel's] effort to highlight the heavy responsibility of the jury by not burdening them with the obvious and avoiding the risk of losing them by arguing the absurd. To do so comes close to insisting on a pro forma argument in every case. Had the jury returned a life sentence the strategy might well have been seen as a brilliant move. That it did not does not mean that it was outside the range of reasonable professional assistance.

<u>Romero v. Lynaugh</u>, 884 F.2d 871, 877 (5th Cir. 1989). In another case, we found no prejudice where defense counsel chose to give no closing whatsoever. <u>Martin v. McCotter</u>, 796 F.2d 813, 819 (5th Cir. 1986).

15

jury's verdict and asking for mercy.  See Stamps v. Rees, 834 F.2d 1269, 1275 (6th Cir. 1987); see also Florida v. Nixon, 534 U.S. __, 125 S. Ct. 551, __, No. 03-931 (Dec. 13, 2004) (rejecting a claim of ineffective assistance where defense counsel strategically chose to concede guilt during trial and focus on begging for his client's life).

We also reject Nixon's claim that trial counsel failed properly to research and dispute the admission of his prior rape conviction, which was used as an aggravator at sentencing.  At the time of trial, controlling Mississippi Supreme Court precedent appeared to preclude any objection on the basis now claimed.  See Phillips v. State, 421 So. 2d 476 (1982).  Further, the issue was raised, fully briefed, and determined in the state's favor on direct review.  See Nixon, 533 So. 2d at 1099.  Even assuming that counsel's failure to research and investigate fully this aspect of the case constitutes deficient performance, Nixon suffered no prejudice.  He remains convicted of two other aggravating factors, each of which sufficiently compels a death sentence in Mississippi law.  Further discussion of this issue will be subsumed in our analysis of the aggravating factor itself, infra.

Nixon's final ground for ineffective assistance, that his lawyers erroneously failed to object to the state's closing argument at sentencing, also fails.  In light of precedent, see Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464 (1986), the district court concluded that there was no prosecutorial misconduct

16

during the closing statement at sentencing. We agree. Because an objection by Nixon's counsel would have been fruitless, there can be no claim of deficient performance under <u>Strickland</u>. If anything, counsel's decision not to object, and thereby highlight the prosecution's arguments to the jury, was a prudent trial decision.

Assuming trial counsel had obtained the mitigation evidence not presented by Nixon until the district court's evidentiary hearing, had excluded Nixon's Texas rape conviction, and had objected to the prosecutor's statement, the result of Nixon's sentencing hearing would have been the same. Juxtaposing Nixon's scant potential mitigating evidence against the calculated, vicious nature of his crime, Nixon did not demonstrate a reasonable probability that the outcome of the sentencing phase would have been different if not for trial counsel's purported deficient performance. As an alternative to procedural bar, we affirm the district court's rejection of Nixon's ineffective assistance claim.

## C.   Prior Violent Felony Claim

Nixon asserts that his prior Texas conviction for rape should not have been introduced before the jury to satisfy the "prior violent felony" aggravating circumstance because he pled guilty to statutory rape,[11] not rape involving the use of force.

---

[11]     Nixon pled guilty to raping his stepdaughter in 1958. The jury heard no testimony about the identity of the victim other than her name, which she did not share with Nixon.

17

See Miss. Code Ann. § 99-19-101(5)(b) (Mississippi law allows as an aggravating circumstance a prior conviction for "another capital offense or of a felony involving the use or threat of violence to the person."). At trial, although he objected on other grounds, Nixon's counsel failed to object to introduction of this prior conviction as an invalid aggravating circumstance. The 1958 Texas indictment to which Nixon pled guilty accused him of "ma[king] an assault and . . . ravish[ing] and hav[ing] carnal knowledge" of a woman under eighteen years of age. The Mississippi Supreme Court upheld this conviction as a prior violent felony based on the Texas Court of Criminal Appeals decision in Rodriques v. State, 308 S.W.2d 39 (Tex. Crim. App. 1957). Nixon, 533 So. 2d at 1098-99. The federal district court independently reviewed the claim and agreed with the Mississippi court, reading Rodriques to stand for the proposition that because an indictment including the terms "ravish" and "assault," could support a conviction for rape by force as well statutory rape, and because the terms were not necessary to a conviction for statutory rape, Nixon's guilty plea qualified the conviction as a prior violent felony.

Rodriques indicates that under Texas law,

> [t]he word "ravish" implies force and want of consent, and its use in the indictment in connection with the allegation of rape of a female between the ages of 15 and 18 years, as here, renders the indictment sufficient to support a conviction for rape by force as well as for statutory rape.

18

*Rodriques*, 308 S.W.2d at 40. However, as Nixon points out, the Texas court went on to hold that "[t]he word 'ravish' is not, however, descriptive of the offense, and it is therefore not necessary that force be proven in order to sustain a conviction under such indictment." *Id.* (emphasis added). Indeed, in *Rodriques*, the Texas court rejected the state's argument that such an indictment could only support a conviction for rape by force. *Id.* As a result, the court held that the defendant should have been permitted to submit a jury instruction indicating that the previous unchaste behavior of the accuser would constitute a valid defense to the indictment — a defense that was only available in statutory rape cases under Texas law at the time. *Id.*

Finding this claim "at least debatable among jurists of reason," we granted a COA on this issue: whether a guilty plea to such an indictment can support a jury finding that Nixon had committed a prior *violent* felony and whether such finding may support the imposition of the death penalty.

For the first time on appeal, the state concedes that Nixon's prior rape conviction should not have been submitted to the jury, but it asserts that this constituted only harmless error.[12] That standard, affirmed in *Brecht v. Abrahamson*, is whether the state court trial error, submission of an invalid aggravating circumstance for the jury to weigh, can be said to have had a

---

[12]    This concession is in contrast to the state's COA brief, in which it claimed that the district court's resolution of the claim was not debatable.

19

"substantial and injurious effect on the verdict reached by the jury." 507 U.S. 619, 623, 113 S. Ct. 1710, 1714 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).[13] Under Brecht, "a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had substantial effect or influence in determining the verdict." Billiot, 135 F.3d at 318 (emphasis added). Further, if, after evaluating the claim in light of the entire record, our minds are in "virtual equipoise as to the harmlessness" of the error, "we must conclude that it was harmful." Id. (citing O'Neal v. McAninch, 513 U.S. 432, 433-36, 115 S. Ct. 992, 994 (1995)).

In Billiot, this court evaluated the submission of an unconstitutionally vague aggravating circumstance and determined that the error would be harmless (a) if the sentence would have been the same had the unconstitutional aggravator never been

_____

[13] The state contends that the Mississippi Supreme Court actually performed a harmless error analysis, a point fervently contested by Nixon, who asserts that therefore this court should conduct Chapman harmless error review in the first instance. See Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967) (establishing a "harmless beyond a reasonable doubt" standard). This particular disagreement is immaterial, however, as circuit precedent requires this court to use the more lenient Brecht review, regardless whether the state court ever conducted a harmless error analysis. See Hogue v. Johnson, 131 F.3d 466, 499 (1997) ("Brecht, rather than Chapman, enunciates the appropriate standard for determining whether a constitutional error was harmless in a federal habeas challenge to a state conviction or sentence even though no state court ever made any determination respecting whether or not the error was harmless."). See also Billiot v. Puckett, 135 F.3d 311, 319 (5th Cir. 1998) (applying the same test in reviewing a weighing state's — Mississippi's — use of aggravating circumstances).

20

submitted to the jury, or (b) if the sentence would have been the same had the unconstitutionally vague aggravating circumstance been properly defined in the jury instructions. 135 F.3d at 319. Only the first condition is applicable here. Thus, we review the record to determine whether there exists more than a mere reasonable possibility that the erroneous submission of the prior violent felony aggravator during the punishment phase of trial substantially affected or influenced Nixon's jury.

Nixon relies on two arguments to support his contention that this error was not harmless. First, Nixon contends that the erroneous introduction of the rape conviction as an aggravating circumstance cannot be harmless because under Mississippi's weighing statute, the conviction fell on "death's side of the scale." Second, Nixon argues that the prosecutor "repeatedly" referred to the rape conviction in his closing argument.

Bolstering Nixon's initial contention is the fact that Joe Ponthieux, who hired Nixon to kill his ex-wife, received a sentence of life imprisonment.[14] The Ponthieux jury apparently considered the aggravating circumstances of "murder for pecuniary gain" and that the "murder was especially heinous, atrocious, or cruel." Nixon's jury returned the same aggravators, in addition to the (invalid) "prior violent felony" aggravator. Thus, Nixon alleges that the invalid aggravator tipped the scales in death's

---

[14] Nixon points to no record evidence to support this assertion, but we assume, arguendo, that this representation is accurate.

21

favor, and had the jury never considered the prior rape conviction, Nixon also would have received a sentence of life imprisonment.

As to the second supporting argument, Nixon points to the following two statements made by the prosecutor during the closing:

> Also introduced into evidence has been a prior conviction of this man.  You will be able to take it back in the jury room with you.  I encourage you to read it.  This man was convicted in the State of Texas for the crime of rape.  Certainly, in a rape, ladies and gentlemen, the victim of that crime was faced with threats of bodily injury, another requirement in the findings you have to make.  I submit to you that all of these have been proved by the State by the testimony of the witnesses in the guilt phase and by the subsequent introduction into evidence of his prior crime.

R. 579.

> The only way to protect society from John B. Nixon, Sr. is to order that he die by lethal injection.  He has proven this over the years.  He has been convicted of rape; and that, of course, involves the use of threat of violence.

R. 584.  Nixon contends that this reiteration of the invalid aggravator "compounded" the constitutional error.

Although Nixon's argument has some merit, we conclude that, had the jury not considered the invalid aggravator, it would nonetheless have sentenced Nixon to death.  This case is unlike Billiot (135 F.3d at 319), where this court noted (without specifically holding)[15] that it was unlikely the jury would have returned the same verdict in the absence of a constitutionally

---

[15]    In Billiot, this court relied on the second prong of the harmless error test, ultimately holding that the jury would have sentenced the defendant to death even if the unconstitutionally vague aggravating circumstance had been properly defined in the jury instructions.  Id. at 320.

22

deficient aggravator heavily emphasized by the state. The "decisive factor" in this jury's sentencing decision was Nixon's conduct and state of mind during the crime. Cf. Hogue, 131 F.3d at 500. In the prosecutor's closing argument against Nixon, most of the emphasis was placed on the "especially heinous" aggravator.[16] This argument marshaled the numerous facts the jury heard in both phases of the trial about the merciless killing of Virginia Tucker. By the time of closing argument, the jury had heard from live witnesses vivid and graphic accounts of Nixon's crime: Nixon agreed to kill Virginia Tucker for money; Nixon brought his two sons along to help him; Nixon rejected the Tuckers' attempt to pay him off instead of killing them, explaining that "the deal's already been made"; Nixon endeavored to kill the sole witness, Thomas Tucker, who escaped when Nixon's gun initially misfired; Nixon gave the murder weapon to his son in the hope that Nixon, Jr. would kill Tucker before he escaped; Mr. Tucker received several

---

[16] After describing the facts, the prosecutor further argued:

Ladies and Gentlemen, if this is not heinous, if it is not cruel or atrocious, I don't know what is. Looking at other aspects of what has constituted capital murder, you could not have returned a verdict of capital murder in this case had you not found what was in the prior jury instructions, that of the paynment [sic] of money. There was money exchanged for this murder. That satisfies the Court's instruction to you that the Judge has just read. Who actually committed this murder? Who actually pulled the trigger? John Nixon, Sr. He is the man that fired the fatal shot, the trigger man. . . . A plea of mercy, ladies and gentlemen, on January the 22nd, 1985, would have availed Virginia Tucker nothing. John Nixon, Sr., was set and determined on taking her life. A plea of mercy in this Court today should not help John Nixon, Sr.

R. 579-80.

gunshot wounds while attempting to flee the crime scene; Nixon, Jr., then returned the gun to his father, who approached Virginia Tucker, whom another assailant held pinned to the floor; Nixon then placed the gun one inch behind Virginia Tucker's head and fired a shot into her brain before running away with the other assailants. Additionally, the jury heard that Virginia Tucker somehow initially survived the gunshot and was discovered on the floor gasping for breath, blood gushing from the wound in her head. Virginia Tucker survived until following day, when she died in the hospital.

In contrast to these brutal details, the jury considered only documentary evidence of Nixon's rape conviction and the two brief statements excerpted above.[17] Neither the statements nor the documentary evidence allude to the fact that Nixon was convicted for raping his stepdaughter; if this emotionally charged fact had been highlighted to the jury, perhaps our <u>Brecht</u> analysis would be altered. Viewing the evidence in its totality, however, <u>see</u> <u>Hoque</u>, 131 F.3d at 500-02, we cannot conclude that there exists anything beyond a mere reasonable possibility that the jury would have come to another conclusion in sentencing Nixon. The slight possibility that the jury might have reached a different verdict is insufficient to provide relief under <u>Brecht</u>.

Finally, Nixon's attempt to compare his death sentence with the life imprisonment sentence received by Ponthieux is

_____

[17]     We also note that Mississippi does not ask a capital sentencing jury to consider "future dangerousness."

unavailing.[18]  Because Ponthieux was tried and convicted in a sepa-

rate trial, comparisons between the two cases — and particularly

the juries involved — are hazardous, especially in regard to

harmless error analysis.  In any event, the two men's roles in the

crime were fundamentally different.  Nixon was the paid killer and

central character in the grisly events described above, while

Ponthieux's goal was to kill his ex-wife whom he had divorced only

three months before the crime.  It is feasible that Ponthieux's

jury considered his crime, though premeditated, one of passion, and

that it held residual doubt as to whether Ponthieux would have gone

through with the crime in the manner Nixon did.  Nixon, moreover,

was engaging in heartless, calculated murder for hire and bringing

his children into the criminal enterprise as well; these facts

qualitatively distinguish Nixon's guilt from that of Ponthieux.

The analysis ultimately depends on whether the record evidence

about Nixon demonstrates more than a mere reasonable possibility

that the invalid prior violent felony conviction could have

substantially influenced the jury's verdict.  Considering the

entire record, the absence of any significant mitigating

circumstances,[19]  the  presence  of  two  valid  aggravating

---

[18]      We base our comparisons on record evidence produced at Nixon's trial and in the state courts.  Cf. supra n.14.

[19]      Nixon urges that the court should consider "mitigating evidence that should have been considered by the jury."  Reply Br. at 23 (emphasis added).  We are unable to do so; in determining whether the jury would have reached the same verdict, we must examine only the record evidence the jury actually considered.  Nixon's counsel asked for leniency from the jury and appealed to the jury's sense of religion.  We cannot conclude that this attempt at mitigation would have been

circumstances, and the <u>Brecht</u> standard, we conclude that Nixon's jury would have returned the same verdict, and thus deem the error harmless.

### III. CONCLUSION

For the reasons discussed above, Nixon's claims on which COA was granted are **DENIED**, and the judgment of the district court denying habeas relief is **AFFIRMED**.

Further, Nixon's petition for rehearing of this court's COA determination, having been considered by this panel, and no active judge on this court having requested a poll for rehearing en banc, is **DENIED**.

---

any more successful had the jury never heard about Nixon's rape conviction.