# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 30, 2011

No. 08-70048

Lyle W. Cayce
Clerk

GARY CARL SIMMONS, JR.,

Petitioner–Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS,

Respondent–Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before DAVIS, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Petitioner Gary Carl Simmons Jr. appeals the denial of his petition for
habeas corpus, brought pursuant to 28 U.S.C. § 2254.  On August 29, 1997,
Simmons was convicted of capital murder, rape, and kidnapping in the Circuit
Court of Jackson County, Mississippi.  After the Mississippi Supreme Court
denied relief on direct review, *Simmons v. State*, 805 So. 2d 452 (Miss. 2001),
and in post-conviction relief proceedings, *Simmons v. State*, 869 So. 2d 995
(Miss. 2004), Simmons filed a federal habeas petition in the U.S. District Court

---

[*] Judge Garza does not join in the per curiam opinion and files his own dissenting
opinion.

No. 08-70048

for the Southern District of Mississippi, raising fifteen grounds for relief.  The district court denied relief on all grounds, but granted a certificate of appealability ("COA") on one ground.  *Simmons v. Epps*, No. 1:04-CV-00496, 2008 WL 4446615 (S.D. Miss. Sept. 26, 2008).  Thereafter this Court granted Simmons a COA on one additional ground and denied it on another.  *See Simmons v. Epps*, 381 F. App'x 339 (5th Cir. 2010) (per curiam) (unpublished).

We consider Simmons's habeas petition on two grounds, both of which challenge his death sentence but not his underlying conviction: (1) whether the trial court erroneously allowed the prosecution to submit to the jury an aggravating circumstance without sufficient evidentiary support in violation of the Sixth, Eighth, and Fourteenth Amendments; and (2) whether the trial court erred during the sentencing phase of his trial by excluding relevant mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments.  We hold that although the "great risk of death" aggravating circumstance was improperly applied to Simmons, the error is nonetheless harmless.  Additionally, we find that the trial court's exclusion of a self-made videotape as mitigating evidence was not objectively unreasonable in light of the clearly established constitutional precedent.  Therefore, we affirm the district court's denial of habeas relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because the facts of this case are adequately set out in both the Mississippi Supreme Court's opinion affirming Simmons's conviction and sentence, *Simmons*, 805 So. 2d 452, and the district court's opinion, *Simmons*, 2008 WL 4446615, we discuss only the facts and procedural history directly relevant to this appeal.

The murder at issue occurred in Simmons's house early in the morning of August 13, 1996.  Jeffrey Wolfe had traveled with his companion, Charlene Leaser, from Houston to Mississippi in order to collect a drug-related debt from

No. 08-70048

Simmons and Timothy Milano, Simmons's ex-brother-in-law. Wolfe and Leaser arrived at Simmons's house late in the evening after Simmons asked Sonny Milano, Timothy's brother, to call Wolfe and ask him to come to the house. Shortly after, Timothy Milano arrived as well. While Simmons and Leaser went into the kitchen to smoke a joint of marijuana, Leaser heard several shots. She saw Wolfe fall to the floor and saw Timothy standing behind him with a gun. Simmons immediately seized Leaser, told her not to look, and brought her into a bedroom where he lay down on top of her. He then questioned her about why they were there, whether she had any drugs, and who knew that they were there. After he finished questioning her, he tied up her hands and feet and placed her in a large metal box.

After Simmons left the room, Leaser managed to free herself from the rope and was attempting to knock the lid off the box. Simmons returned at that point, stripped her of her clothes and jewelry, retied her, and placed her back in the box. When Simmons returned again, he raped her, then retied her and placed her back in the box. Later, after hearing nobody answer the ringing phone, Leaser surmised that nobody else was in the house and managed to force the lid off of the box. She then ran across the street to a neighbor, who called the police. Although Leaser's suitcases were still inside Simmons's house when she reentered with the police, her money was gone.

Shortly after police arrived on the scene and secured a search warrant, they noticed a small boat docked on the bayou behind Simmons's house, and in it, a piece of flesh. They also discovered several buckets, a bushhook, and a knife, all of which had blood on them. Shortly after this discovery, they began collecting body parts from the bayou, a task that took several days. Testimony from trial established that officers and coroner's office officials collected eighty-five pounds of human remains on the first day and forty-one pounds on the second day. Several portions of the body had bullet holes, and Dr. Paul McGarry

3

No. 08-70048

testified that the body parts had been cut sharply and precisely and the bones separated from flesh. Ultimately, the body parts collected were identified as Wolfe's. At trial, Simmons's co-worker in the meat department of the grocer where they both worked testified that Simmons had taken his butcher's knives home with him on the evening of the murder, which he found unusual.

During both a pre-trial suppression hearing and during the trial, Lee Merrill, an investigator with the Moss Point Police Department who was involved with removing Wolfe's remains from the bayou, testified about the bayou and his collection of the body parts. He testified that although he began finding body parts twenty to thirty feet from where the boat was located, he ultimately found body parts as far as 150 yards away. He further noted that the bayou was approximately eight to nine feet wide and four feet deep, and contained fish and crabs, and that he had seen an alligator once during his time there. He also stated, and the Mississippi Supreme Court later found as fact, that the bayou had a current and ran into a tributary that itself eventually flowed into the Gulf of Mexico. Simmons's neighbor and friend Rita Taylor also testified at trial about the bayou, which she referred to as the "canal," and the surrounding area. She stated that their neighborhood was "somewhat rural," and that she had seen alligators in the bayou. Taylor noted that Simmons would "play around with them," and on one occasion she saw him shoot at one a few times.

At trial, Simmons's friend Dennis Guess also provided crucial testimony. He described returning from work on August 14, the day after the murder, to find Simmons in his house. Guess testified that Simmons told him that he had "whacked a drug dealer" and then had "deboned him, cut him up in little pieces, and put him in the bayou." Guess noted that Simmons was disappointed because Wolfe only had one thousand dollars on his person, but that Simmons was hoping that he would have much more. After confiding to Guess that he felt

4

his only options were to run, commit suicide, or turn himself in, they decided that Simmons would turn himself in. Simmons then called a Jackson County deputy who picked him up.

One issue of contention during the trial and sentencing was a videotape Simmons recorded for his ex-wife, Lori, and his two daughters on the morning of the murder before turning himself in. In the videotape, he expressed remorse without ever referring directly to Wolfe's murder. He made, among others, the following statements:

> I guess it's a real mess, isn't it? It wasn't supposed to go like that. . . . Things got pressing in. I was in a bind three or four different ways. To my way of thinking, I didn't have much of a choice. I mean, I'd already taken his money. There's no excuses.
> . . . .
> It's hard sitting here doing this, knowing under what conditions you'll probably be watching it. I'm so dreadfully sorry.
> . . . .
> I didn't think about it until after it was done. And then it couldn't be undone. There was nothing in the world I could do to make it undone. And I would have. Oh, God, I would have. You never realize how close you are to the edge until you actually step over it.
> . . . .
> I don't know how it happened, I really don't. And after it had happened, I would have gave anything to take it back, even my life.

After Simmons sent the videotape to Lori, she turned it over to Simmons's attorneys. At trial, the State moved to compel Simmons to turn over the videotape, and the court granted the motion. Simmons attempted to introduce the videotape during both the guilt and sentencing phases of the trial, but the court ruled it inadmissible.

After a trial that lasted most of one week, the jury found Simmons guilty of capital murder, kidnapping, and rape. Simmons received life sentences for the kidnapping and rape, and the trial proceeded to the sentencing phase for capital murder. The court instructed the jury that in order to return the death penalty,

No. 08-70048

it must first find that Simmons either (1) killed Wolfe; (2) attempted to kill Wolfe; (3) intended that the killing of Wolfe take place; or (4) contemplated that lethal force would be employed.  If it found one of the four, it must then decide whether one or both of the two aggravating circumstances the State had submitted applied, and if so, weigh the aggravating and mitigating circumstances.    The court submitted the following two aggravating circumstances to consider: (1) Simmons "knowingly created a great risk of death to many people"; and (2) "the capital offense was committed for pecuniary gain during the course of a robbery."

During the sentencing hearing, the State called no witnesses and did not make an opening statement other than to introduce forty-six exhibits from trial, including the tools used to dismember Wolfe.  Simmons called six mitigation witnesses, including his ex-wife, his half-brother, and his half-sister.  The witnesses generally testified that he was a "family man" who cared deeply for his daughters and often worked several jobs at a time to provide for his family. Further, they noted that the crimes Simmons was charged with were totally out of character for him.  Simmons's step-brother also testified that Simmons had a difficult childhood, and that Simmons's step-father beat him almost every day and beat their mother.  The jury returned a verdict of death for Simmons.  It found that Simmons intended that the killing take place and that lethal force be employed, and that both aggravating circumstances were satisfied and that they outweighed the mitigating circumstances.  Simmons filed a motion for a new trial, which was denied.

Simmons appealed his conviction and sentence to the Mississippi Supreme Court, citing twenty-seven different errors by the trial court.  The Mississippi Supreme Court denied relief.  As to the two issues contested here, the Mississippi Supreme Court found that although Simmons failed to preserve error by objecting to the "great risk of death" aggravating circumstance during

6

No. 08-70048

sentencing, it was nonetheless obligated to review whether the aggravator was supported by sufficient evidence. *Simmons*, 805 So. 2d at 495–96. The State had abandoned the argument used at trial, namely, that the great risk of death to many people related to Simmons's trapping Leaser in the metal box. Instead, the Mississippi Supreme Court considered whether Simmons had knowingly created a great risk of death to many people because of Milano's firing of a rifle in a residential neighborhood, or because of Simmons's disposal of Wolfe's remains in the bayou. After rejecting the first explanation, the Supreme Court held that the disposal of Wolfe's body satisfied the aggravator because (1) Wolfe's remains created a "toxic mixture" that endangered residents who used the water, and (2) Simmons's disposal of the remains was intended to attract alligators that would endanger "adjoining landowners" and "water enthusiasts." *Id.* at 496.

The Mississippi Supreme Court also rejected Simmons's claim that the trial court erred by excluding the videotape from sentencing. It found that the videotape was "both irrelevant, as well as inadmissible, hearsay." *Id.* at 488. The Mississippi Supreme Court addressed his argument that the denial of the videotape prevented him from demonstrating his remorse for the crime, explaining that because he was present at trial and decided not to testify, the relevant hearsay exception was unavailable to him. *Id.* It then noted that admitting a self-serving declaration like the videotape would open the door to abuse, because "an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence." *Id.* at 489. Three justices, however, issued a dissent on this issue. The dissent distinguished the use of such evidence at sentencing from its use at trial, and noted that the cases relied upon by the majority dealt with hearsay evidence during the guilt phase and not the punishment phase. *Id.* at 509–10 (Diaz, J., concurring in part and dissenting in part). Justice Diaz cited *McClesky v. Kemp,*

7

481 U.S. 279, 306 (1987), for the proposition that Simmons was entitled to have the jury consider any relevant circumstance during sentencing. *Id.* at 509. The dissent also cited Mississippi Supreme Court cases holding that "Mississippi allows evidence of mitigating circumstance of an unlimited nature." *Id.*

Simmons then instituted state post-conviction proceedings to challenge his conviction and sentence. The Mississippi Supreme Court denied relief in 2004 and, in so doing, found that both issues relevant to this appeal were barred by res judicata. *Simmons*, 869 So. 2d at 1000, 1006. On October 15, 2004, Simmons filed a petition for writ of habeas corpus in the U.S. District Court for the Southern District of Mississippi, raising fifteen grounds for relief. The district court denied relief on all grounds. As to the "great risk of death aggravating circumstance," the district court found that although the record did not support the Mississippi Supreme Court's "toxic mixture" holding concerning the disposal of Wolfe's body, the evidence was sufficient to support its alligator theory and thereby support the aggravator. *Simmons*, 2008 WL 4446615, at *12. Additionally, the district court found that the exclusion of the videotape was not constitutional error. *Id.* at *31.

Simmons requested a COA on three issues: (1) whether the trial court erroneously allowed the prosecution to submit to the jury an aggravating circumstance without sufficient evidentiary support in violation of the Sixth, Eighth, and Fourteenth Amendments; (2) whether Simmons was denied effective assistance of counsel during the penalty phase of his trial, in violation of the Sixth and Fourteenth Amendments; and (3) whether the trial court erred during the sentencing phase of his trial by excluding relevant mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments. The district court granted Simmons a COA as to the first issue, but denied it as to the second and third. Simmons filed a motion to expand the COA, and we granted a COA as to

the third issue and denied it as to the second. *Simmons*, 381 F. App'x at 340. Simmons then timely filed this appeal.

## II. STANDARD OF REVIEW

We review the district court's legal conclusions de novo and its factual findings for clear error. *Ladd v. Cockrell*, 311 F.3d 349, 351 (5th Cir. 2002). Simmons filed his federal habeas petition after 1996, so the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to his claims. *See Cantu v. Thaler*, 632 F.3d 157, 162 (5th Cir. 2011) (citing *Lindh v. Murphy*, 521 U.S. 320, 324–26 (1997)). Under AEDPA, we cannot grant habeas relief for claims that were adjudicated on the merits in state court proceedings unless that adjudication either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "We review pure questions of law under the 'contrary to' standard of sub-section (d)(1), mixed questions of law and fact under the 'unreasonable application' standard of sub-section (d)(1), and pure questions of fact under the 'unreasonable determination of facts' standard of sub-section (d)(2)." *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) (citation omitted).

A decision is contrary to clearly established federal law under § 2254(d)(1) if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The state court makes an unreasonable application of clearly established federal law if the state court (1) "identifies the correct governing legal rule from [the Supreme] Court's

No. 08-70048

cases but unreasonably applies it to the facts"; or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. In order to find that the state court's application of law to facts was unreasonable, its result must have been "more than incorrect or erroneous" but must be "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (quoting *Williams*, 529 U.S. at 409). We presume that factual determinations of the state court are correct; the petitioner must rebut this presumption by clear and convincing evidence. *See* § 2254(e)(1); *Woods v. Quarterman*, 493 F.3d 580, 587 (5th Cir. 2007).

### III. DISCUSSION

Simmons alleges two points of constitutional error on his appeal. First, he claims that the "knowingly created a great risk of death to many persons" aggravating circumstance found by the jury during sentencing and affirmed by the Mississippi Supreme Court lacks sufficient evidentiary support in violation of the Sixth, Eighth, and Fourteenth Amendments. Second, he alleges that the trial court erred by excluding relevant mitigating evidence during sentencing; namely, that the exclusion of the videotape Simmons made shortly after the murder in which he expressed remorse violated his rights under the Sixth, Eighth, and Fourteenth Amendments.

### A.    Sufficiency of the Evidence on the Aggravating Circumstance

Simmons first notes that the jury found that he "knowingly created a great risk of death to many people" based on the State's argument that he created this risk by locking Charlene Leaser in a metal box for several hours. He also asserts that the State misstated the aggravating circumstance in its closing argument during sentencing, referring to it simply as "great risk of harm or death." On direct appeal, the State abandoned this line of argument and instead asserted that Simmons created a great risk of death to many people when (1) Milano

10

No. 08-70048

repeatedly fired a rifle in a residential neighborhood, and (2) when Simmons created a "toxic mixture" in the bayou by disposing of Wolfe's body parts and did so to attract alligators, both of which created the risk to recreational users of the bayou.  The Mississippi Supreme Court rejected the first explanation but found that Simmons's disposal of Wolfe's body parts in the bayou satisfied the aggravating circumstance because (1) it created a "toxic mixture" that endangered residents who used the water, and (2) it was intended to attract "alligators and other similar creatures" that subjected nearby residents and "water enthusiasts" to inherent danger.

Using this trial and appellate history, Simmons claims that the jury found an aggravating circumstance without sufficient evidentiary support in violation of his Sixth, Eighth, and Fourteenth Amendment rights.  Simmons first contends that the Mississippi Supreme Court's acceptance of the public health and alligator theories violated *Ring v. Arizona*, 536 U.S. 584 (2000), because it used facts not found by the jury to make Simmons eligible for the death penalty. Second, he asserts that the Mississippi Supreme Court's decision was based on an unreasonable determination of the facts and that the evidence was insufficient for a reasonable jury to find the aggravating circumstance beyond a reasonable doubt.

### 1.    Sufficiency of the Evidence

As a first matter, we may not consider Simmons's argument that the Mississippi Supreme Court's determination of a new factual basis for the "great risk of death" aggravating circumstance deprived him of his constitutional right under *Ring* to have a "jury determination of any fact on which the legislature conditions an increase in their maximum punishment."  536 U.S. at 589. Simmons sought, and the district court granted, a COA to determine whether "the trial court erroneously allowed the prosecution to submit to the jury an aggravating circumstance without sufficient evidentiary support in violation of

11

No. 08-70048

[Simmons's] Sixth, Eighth and Fourteenth Amendment rights as set forth in the United States Constitution." Simmons's argument about allegedly improper appellate fact finding is therefore outside of the scope of his sufficiency-of-the-evidence argument. "We have jurisdiction to address only the issue specified in the COA." *United States v. Daniels*, 588 F.3d 835, 836 n.1 (5th Cir. 2009) (citing *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)). Because Simmons's argument falls outside the scope of the COA, we may not address it here.

The Supreme Court has held that habeas relief is proper if we find "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In *Lewis v. Jeffers*, the Supreme Court extended this principle to hold that a petitioner's due process or Eighth Amendment rights are violated when a state court finds an aggravating circumstance that no reasonable sentencer could have based on the evidence adduced at trial. 497 U.S. 764, 783 (1990). We must therefore evaluate the sufficiency of the evidence using the "rational factfinder" standard established in *Jackson*. *See id.* at 781.

The aggravating circumstance at issue here is one of eight allowed under Mississippi law. *See* MISS. CODE ANN. § 99-19-101(5). The aggravator reads: "The defendant knowingly created a great risk of death to many persons." *Id.* § 99-19-101(5)(c). The Mississippi Supreme Court has held that this aggravator is not restricted to "those crimes where very large numbers of individuals were at risk or those where the safety of others than an intended few was jeopardized." *Jackson v. State*, 684 So. 2d 1213, 1235 (Miss. 1996). It has also held that the aggravator was improperly given, however, when there was "no evidence that [the defendant] *knowingly* created a great risk of death to anyone, other than . . . his intended victim." *Porter v. State*, 732 So. 2d 899, 906 (Miss. 1999).

12

No. 08-70048

In the present case, the Mississippi Supreme Court rejected the argument that Simmons satisfied the aggravator because Milano fired a gun in the middle of the night in a residential neighborhood when only Simmons, Wolfe, and Leaser were in the house. *See Simmons*, 805 So. 2d at 496. In so doing, it noted that it declined to find that these three people together constituted "many" people under the aggravator. *Id.* Instead, it found the following:

> Simmons contaminated the recreational waters of the residential neighborhood with Wolfe's remains, much of which was not recovered by police. These actions were intended to attract alligators and other similar creatures in an effort to use what nature had to offer to dispose of the evidence. Adjoining landowners and other water enthusiasts were subjected to this inherent danger as a direct result of Simmons' actions. In addition, all of those residents who used that water as it carried the solid and liquid remains of Wolfe through tributaries into the Gulf of Mexico were subjected to this toxic mixture as well.

*Id.* Thus, the Mississippi Supreme Court held that the evidence adduced at trial was sufficient to support the aggravator because when Wolfe dumped the chopped up remains of Wolfe into the bayou, he (1) created a toxic mixture that threatened residents who used the bayou, and (2) intended to attract alligators who would eat the remains, thus also endangering nearby residents and "water enthusiasts."

Because the facts marshaled by the Mississippi Supreme Court were an unreasonable determination in light of the trial record, there was insufficient evidence to sustain the aggravating circumstance. First, we agree with the district court that the trial record is absent of any testimony or other evidence that disposing of Wolfe's body parts in the bayou created a "toxic mixture" that posed a great risk to human life. The State concedes as much on appeal, noting in its brief that "[b]ecause this was not argued by the prosecution at trial the respondents can have no quarrel with this finding by the district court." Not only is the trial record devoid of any evidence that disposing of Wolfe's remains

13

in the bayou could create a toxic mixture, the record provides little evidence about use of the bayou by residents or "water enthusiasts."

As to the alligators, the district court found that the risk of attracting alligators that would threaten "adjoining landowners" or "water enthusiasts" who used the bayou would nonetheless satisfy the aggravator. This finding is clearly erroneous. There is ample evidence in the record to support a finding that alligators inhabited the bayou. Simmons's neighbor and friend, Rita Taylor, testified that there were alligators in the bayou, and noted an incident where Simmons shot at one of them. Additionally, police investigator Lee Merrill testified that in the course of the several days he spent helping to collect Wolfe's remains, he once saw an alligator. Viewed in the light most favorable to the state, this evidence establishes (1) that there are alligators in the bayou, and (2) that Simmons knew that there were alligators in the bayou. Additionally, we may fairly infer that alligators might eat human remains disposed of in the bayou. Accepting these facts as true, the evidence is still insufficient to find that by disposing of Wolfe's remains in the bayou, Simmons "knowingly created a great risk of death to many people."

Most importantly, the evidence in the record establishes that alligators were already present in the bayou. Therefore, to the extent that we may speculate that "adjoining landowners" and "water enthusiasts" used the bayou for recreation and that alligators threatened these people with a great risk of death, they already faced this threat regardless of the disposal of Wolfe's remains. Additionally, aside from the testimony that Simmons had once shot at an alligator in the bayou, and that his neighbor owned a boat that he used on the bayou, there is a dearth of evidence in the record of any other "adjoining landowners" or "water enthusiasts" using the bayou for recreational purposes. Moreover, Lee Merrill's testimony indicates that police and coroners began

collecting Wolfe's remains from the bayou only hours after Leaser called the police the morning following the shooting and body-parts disposal.

Finally, the aggravating circumstance requires that Simmons *knowingly* create a great risk of death to many people. To find this intent, jurors must infer from the fact that Simmons knew there were alligators in the bayou, that his intent was for the alligators to consume Wolfe's remains, thereby destroying the evidence. Even viewing this inference as permissible based on our deferential review of facts found by the Mississippi Supreme Court, finding that Simmons satisfied the knowledge component of the aggravator would require assuming that he knew that (1) the body parts would attract alligators not already present in the bayou, and (2) that more than a couple of "adjoining landowners" and "water enthusiasts" would use this stretch of water before the alligators consumed Wolfe's remains. This rank speculation is unsupported by the record.

While we recognize the deferential standard of review we must employ in reviewing the state court's findings of fact, and their own prerogative in defining the scope of the aggravating circumstance within constitutional bounds, Simmons has shown by clear and convincing evidence that the Mississippi Supreme Court's finding of fact regarding the "toxic mixture" and risk of alligators are unreasonable given the facts in the record. Therefore, there is insufficient evidence for a rational fact-finder to find beyond a reasonable doubt that Simmons knowingly created a great risk of death to many people, and the trial court's submission of the instruction was error.

### 2. Effect of the Error

Having found that the "great risk of death" aggravator was submitted in error, we must determine the effect of the error. The State argues that even if we find that the "great risk of death to many people" aggravator was unsupported by the evidence, there is nonetheless no constitutional error. The

No. 08-70048

State contends in light of the Supreme Court's decision in *Brown v. Sanders*, we must now apply the following principle:

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

546 U.S. 212, 220 (2006). Arguing that the district court correctly found that the evidence used to support the "great risk of death to many people" aggravator was also relevant to the pecuniary-gain aggravator, the State urges us to find that the sentence was still constitutional. Simmons urges that the facts and circumstances relevant to the invalidated aggravator are not relevant to the pecuniary-gain aggravator.

At least prior to *Sanders*, in "weighing states"[1] such as Mississippi, an invalidated aggravating factor used in imposing a death sentence rendered the sentence unconstitutional. *See Sochor v. Florida*, 504 U.S. 527, 532 (1992). The Supreme Court noted that this rule stems from the fact that "eligibility factors by definition identified distinct and particular aggravating features, [so] if one of them was invalid the jury could not consider the facts and circumstances

---

[1] The Supreme Court has previously distinguished between "weighing" and "non-weighing" states in the application of death-penalty sentencing. The distinction between these states occurs after the state has applied statutorily defined eligibility factors that narrow the class of defendants convicted of murder who are eligible for the death penalty. *See Sanders*, 546 U.S. at 216. "Once this narrowing requirement has been satisfied, the sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it." *Id.* In weighing states, "the only aggravating factors permitted to be considered by the sentencer were the specified eligibility factors." *Id.* at 217. Therefore, in weighing states, "the sentencer's consideration of an invalid eligibility factor necessarily skewed its balancing of aggravators with mitigators and required reversal of the sentence" unless the error was found to be harmless. *Id.* (citing *Stringer v. Black*, 503 U.S. 222, 232 (1992)) (internal citation omitted). For non-weighing states, "a State that permitted the sentencer to consider aggravating factors different from, or in addition to, the eligibility factors," the Supreme Court "set forth different rules governing the consequences of an invalidated eligibility factor." *Id.* at 217–18.

relevant to that factor as aggravating in some other capacity." *Sanders*, 546 U.S. at 217. Therefore, after invalidating one of the aggravating circumstances, we were compelled to reverse the sentence unless we determined that the error was nonetheless harmless under the standard adopted in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *See Nixon v. Epps*, 405 F.3d 318, 329–30 (5th Cir. 2005).

*Sanders*'s language, however, leaves great ambiguity as to whether the principle announced above applies in weighing as well as non-weighing states. In the paragraph prior to announcing its test, the Supreme Court explained that the "weighing/non-weighing scheme is accurate as far as it goes, but it now seems . . . needlessly complex." *Sanders*, 546 U.S at 219. It went on, however, to preface announcement of the test by noting: "We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to *non-weighing States*, if we are henceforth guided by the following rule . . . ." *Id.* at 220 (emphasis added). The Court did not appear to explicitly overrule its precedent that creates the "weighing/non-weighing" bifurcation, but used some language that nevertheless suggests that the distinction is a remnant of the past. The Sixth Circuit has held that the *Sanders* test does not apply to weighing states, noting the Court's mention of simplifying the analysis the Court has applied to non-weighing states. *See Wilson v. Mitchell*, 498 F.3d 491, 507 (6th Cir. 2007). The Eleventh Circuit, without deciding the issue, indicated that "it is probable that the Court's decision . . . announced a uniform rule to be applied in weighing and nonweighing states alike." *Jennings v. McDonough*, 490 F.3d 1230, 1255 n.22 (11th Cir. 2007). Like the Eleventh Circuit in *Jennings*, we need not decide today whether the Supreme Court intended *Sanders* to apply in weighing states, because we find that the submission of the "great risk of death" aggravator was harmless error.

In our case law, when an aggravating circumstance was improperly submitted to the sentencer we have applied the test found in *Brecht* to determine

if the error was harmless.  *See Nixon*, 405 F.3d at 329–30; *Billiot v. Puckett*, 135 F.3d 311, 318 (5th Cir. 1998).  The Supreme Court recently affirmed the propriety of applying the *Brecht* test when conducting harmless error review in habeas proceedings "when the state appellate court failed to recognize the error and did not review it for harmlessness." *Fry v. Pliler*, 551 U.S. 112, 114 (2007). Under *Brecht*, we may not grant Simmons relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We have interpreted this standard to mean that habeas relief is only proper if there is "more than a reasonable probability" that it could have contributed to the decision to impose the death sentence.  *Billiot*, 135 F.3d at 318 (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir. 1996)).  If, however, "our minds are 'in virtual equipoise as to the harmlessness,'" we must find that the error was harmful.  *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 433–36 (1995)).  Thus, under our standard, the error is harmless if we find that "the sentence would have been the same had the unconstitutional aggravator never been submitted to the jury." *Nixon*, 405 F.3d at 330 (citing *Billiot*, 135 F.3d at 319).

The State argues that even if we hold the "great risk of death to many people" aggravator constitutionally invalid in this case, the error was nonetheless harmless to the jury's sentencing determination.  First, it argues under the guise of the *Sanders* test that the jury could have properly considered the evidence that Leaser was kept locked in a metal box and stripped of her clothes and belongings under the pecuniary-gain aggravator.  It further argues that the jury was authorized to consider the detailed circumstances of the crime, and that the jury would have nevertheless returned a verdict of death considering: (1) Simmons planned the murder in hopes of robbing Wolfe; (2) he raped and imprisoned Leaser in a metal box for several hours; and (3) he

butchered Wolfe's body. The State also notes that the prosecutor only mentioned the "great risk" aggravator twice in his closing argument during sentencing, and cites our decision in *Nixon*, where we found the submission of an invalid aggravating circumstance harmless error under the *Brecht* test. 405 F.3d at 331.

The State offered a fairly limited case during Simmons's sentencing. It made no opening argument, instead introducing forty-six exhibits from the trial, including evidence such as the knife and bushhook used to dismember Wolfe's body. Aside from this and some limited cross-examination of two of Simmons's mitigation witnesses, the only other argument or evidence offered was during closing argument. The first prosecutor explained that the jury first needed to find that Simmons intended that Wolfe's killing take place and satisfy at least one of the two qualifying factors offered, which were the same as the aggravating factors, before balancing the aggravating against the mitigating circumstances. The State made the following argument with respect to the "great risk of death" aggravator:

> Aggravating circumstance in this case, number one, is we submit to you he created a great risk of harm or death. Think of what was going on in the box for about six or seven hours. Think of what was going to happen to her. Think of what they consciously did to Jeffrey Wolfe, knowing that they were going to have to get rid of everything, every piece of evidence including the body.
> . . .
> Where does all this lead? What was he going to do with the eyewitness to this crime? What do you think was happening? Common sense. You have heard all the evidence. Based on everything you heard, I think it is reasonable to infer, to believe based on everything else, that this was going to happen to her. So, that's submitted to you. That's submitted to you because we think that was going to happen. I think you think it was going to happen. You know it was going to happen.

Thereafter, the prosecutor introduced the pecuniary-gain aggravator, spending about the same amount of time discussing evidence of Simmons's financial

troubles and arguing that the murder was motivated by a desire to rob Wolfe. Only once more did the prosecutor refer to evidence that Simmons locked Leaser in a box, merely stating: "remember Brooke."

As a first matter, we reject the State's argument that the error was harmless because under the jury instruction, the jury could have nonetheless considered all of the circumstances of the crime. While the jury was allowed to consider all the circumstances of the crime when considering (1) whether Simmons intended that the killing of Wolfe take place and (2) what mitigating evidence existed in the case, this was not the case with respect to aggravating circumstances. The jury instruction was clear that once the jury found that Simmons intended the killing take place and that he satisfied one of the eligibility factors, it must "consider only the following elements of aggravation in determining whether the death penalty may be imposed." Because we have ruled one of those two aggravating circumstances invalid, we must consider only the evidence presented that was relevant to the remaining aggravating circumstance. Regardless, we find that the error was harmless.

Throughout trial and sentencing, the jury heard extensive testimony and evidence related to Simmons's financial motives in murdering Wolfe. Indeed, this was the primary theory upon which the State sought to convict Simmons; the jury ultimately found him guilty of capital murder because of the underlying felony of robbery. The jury heard, among other evidence, that Simmons: asked that Sonny Milano call Wolfe and ask him to come over to Simmons's house that night; brought home butcher knives from work; borrowed a boat from his neighbor; owed a drug-related debt to Wolfe; was having financial difficulties; took approximately $1,000 from Wolfe after his murder and was disappointed that he did not have more money on his person; likely took Leaser's money while she was trapped in the metal box; and sought to hide the evidence by dismembering Wolfe and disposing of his remains in the bayou.

No. 08-70048

Further, the State's closing argument again emphasized the pecuniary-gain aggravator. The State noted that Simmons's ex-wife had admitted on cross-examination during her mitigation testimony that Simmons was having financial difficulties, and argued that he was not in a position to pay off the large debts he owed to Wolfe. Based on this, the State emphasized that in convicting Simmons of capital murder, the jury had already found that the murder was committed during the course of a robbery and that he did so because he could not extinguish his debt to Wolfe. The State also recapitulated its theory of Simmons's role in the murder in its final argument, suggesting among other things that Simmons planned the murder, needed the money, and had "told Sonny Milano to call Jeffrey Wolfe and come to his death."

Additionally, the fact that Simmons locked Leaser in a box and stripped her of her belongings also relates to Simmons's pecuniary motives for the murder. That Leaser was locked up and had her belongings taken, including cash that she brought with her from Houston, is relevant to showing similar motive and intent with respect to Wolfe's murder. It was also during the time that Leaser was trapped in the box that Simmons was able to strip Wolfe of approximately $1,000. Therefore, some of the evidence that the State submitted under the invalid aggravator was actually relevant to the pecuniary-gain aggravator. The evidence regarding Leaser should not have been submitted under the "great risk of death to many people" aggravator in the first place, as evidenced by the State's post-hoc justifications regarding the disposal of Wolfe's body creating the risk due to a "toxic mixture" and alligators. It is thus not surprising that some of this evidence properly relates to another aggravator.

In contrast to the extensive evidence properly related to the pecuniary-gain aggravator, the only evidence that must be excluded under the invalidated aggravator is (1) the aggravator itself and (2) the State's suggestion during closing argument that Simmons planned to kill Leaser. While this latter

21

argument does have the potential to inflame the passions of the jury, it pales in comparison to the more extensive and equally disturbing evidence that the jury could consider under the pecuniary-gain aggravator. Further, in *Nixon*, we held harmless the improper introduction of documentary evidence of the petitioner's prior rape conviction and the prosecutor's two references to it during closing argument when the bulk of the evidence and argument presented related to the other aggravator. 405 F.3d at 331. Thus, the inflammatory nature of a certain argument does not, in itself, make the error harmful. Here, the prosecutor spent at least equal time emphasizing the pecuniary gain aggravator as the invalidated aggravator. Moreover, some of the evidence emphasized during his argument concerning the "great risk of death" aggravator could have been properly emphasized by the prosecutor under the pecuniary-gain aggravator.

Contrary to the dissent, we find this Court's decision in *Nixon* analogous to the situation here. While the dissent notes that the State repeatedly suggested that Simmons would have killed Leaser had she not escaped from the box, the prosecutor made this argument twice during closing argument, the latter quite briefly. Similar to this case, this Court in *Nixon* found the introduction of an improper aggravating circumstance harmless when the prosecution improperly introduced documentary evidence of the petitioner's rape conviction and referred to it twice during closing argument. *Id.* at 331. The Court then contrasted this with the "brutal details" the jury was properly allowed to consider, as here, under the other aggravator. *Id.* Although the prosecution here emphasized the probability that Simmons would have killed Leaser slightly more than the prosecutor in *Nixon* emphasized the rape in that case, if anything, the *actual evidence* of the rape is more likely to significantly prejudice a jury than the *mere possibility* that Simmons would have ultimately killed Leaser. Given the similarities between the amount of improper evidence

and the prosecutor's improper argument in both cases, we find *Nixon* hard to distinguish in any meaningful way.

Because a substantial portion of the prosecution's argument and the bulk of the evidence referred to by the State during sentencing went to Simmons's intent to commit the murder for pecuniary gain during the course of a robbery, we find that the "great risk of death" aggravator did not have a "substantial and injurious effect" on the jury's sentencing decision. We thus affirm the district court's denial of habeas on this ground.

## B.    Exclusion of Videotape as Mitigating Evidence

Simmons argues that the trial court's denial of his motions to introduce a videotape he made hours after the murder violates his Eighth and Fourteenth Amendment rights to introduce all relevant mitigating evidence in the penalty phase. In the videotape, addressed to his ex-wife and children, Simmons expressed remorse without directly admitting the murder. He points to two closely related lines of cases, each of which he claims supports his claim for relief. First, he notes the Supreme Court's command in *Lockett v. Ohio*, 438 U.S. 586 (1978), subsequently reemphasized in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), that:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Lockett*, 438 U.S. at 604–05. Second, he claims that the videotape's exclusion violates the principle announced in *Chambers v. Mississippi*, 410 U.S. 284 (1973), concerning guilt, and extended to capital sentencing in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302. Specifically, he argues that like the evidence in *Green*, the excluded videotape

was "highly relevant to a critical issue in the punishment phase of the trial," and "substantial reasons existed to assume its reliability." *Green*, 442 U.S. at 97.

In *Chambers*, the Supreme Court considered the petition of a man sentenced to life in prison for the murder of a police officer. 410 U.S. at 285. Prior to the petitioner's trial, another man, McDonald, gave a sworn confession that he had committed the murder and had already confessed this to another friend, before later retracting his confession. *Id.* at 287–88. At the petitioner's trial, the trial court denied his request to call McDonald as an adverse witness as well as three witnesses to whom McDonald had confessed, finding that the testimony of the other three would constitute hearsay. *Id.* at 291–92. The Supreme Court reversed the petitioner's conviction, holding that "the exclusion of this critical evidence, coupled with the State's refusal to permit [the petitioner] to cross-examine McDonald, denied him a trial in accord with . . . due process." *Id.* at 302. The Court noted that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* Despite this broad language, the Court noted that its holding did not establish new constitutional principles, but instead that "under the facts and circumstances of this case," the petitioner was denied a fair trial. *Id.* at 302–03. The Court also noted that the hearsay statements it ruled should have been admitted "were originally made . . . under circumstances that provided considerable assurance of their reliability." *Id.* at 300.

The Supreme Court applied a similar principle in the context of capital sentencing several years later. In *Green*, the Supreme Court reversed the death sentence of the petitioner after the trial court excluded from the sentencing as hearsay the testimony of a man, Moore, who claimed that another man had confessed to committing the murder. 442 U.S. at 96. The Supreme Court held that regardless of Georgia's hearsay rule, "under the facts of this case," the

No. 08-70048

testimony's exclusion was a due process violation. *Id.* at 97. The Court noted that the testimony was "highly relevant to a critical issue in the punishment phase of the trial," and "substantial reasons existed to assume its reliability." *Id.* These "substantial reasons" to find the testimony reliable were: (1) Moore's confession was made spontaneously to a close friend; (2) the confession was corroborated by ample evidence; (3) the statement was against interest and nothing suggested an ulterior motive; and (4) "[p]erhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a death sentence upon it." *Id.* Therefore, the Supreme Court held that "[i]n these unique circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice.'" *Id.* (quoting *Chambers*, 410 U.S. at 302).

We have held that the application of these cases is quite limited. We have noted that "*Green* is limited to its facts, and certainly did not federalize the law of evidence. It does, however, indicate that certain egregious evidentiary errors may be redressed by the due process clause." *Barefoot v. Estelle*, 697 F.2d 593, 597 (5th Cir.), *aff'd*, 463 U.S. 880 (1983). In *Edwards v. Scroggy*, we considered the trial court's exclusion of testimony by the petitioner's mother and priest that the petitioner was sorry for his participation in the murder and, if his life were spared, that he would "serve God" and "do something with his life in the future in a very constructive way." 849 F.2d 204, 211–12 (5th Cir. 1988). We found that the exclusion was not unconstitutional under *Green* and *Eddings*, holding that Mississippi's exclusion of hearsay evidence "was not unnecessarily limiting, nor did it operate to render [the petitioner's] trial fundamentally unfair." *Id.* at 212.

Given the limitations imposed by both the case law and the scope of our review under AEDPA, we cannot say that the state court's exclusion of the videotape as hearsay was objectively unreasonable or that the exclusion

25

rendered the sentencing fundamentally unfair. The Supreme Court was clear that its holdings in both *Green* and *Chambers* were based on unique and disturbing facts: the exclusion of evidence about another person confessing to the murder. While evidence of Simmons's remorse would surely have been relevant to the jury's consideration of mitigating factors, the probative value of the videotape pales in comparison to the excluded evidence in *Green* and *Chambers*.

More importantly, the statements in Simmons's videotape did not have the "considerable assurance of reliability" that the Supreme Court found in *Chambers* or the "substantial reasons" to support its reliability that the Court found in *Green*. Although the videotape here in which Simmons expressed some remorse does contain some indicia of reliability, we cannot say that its reliability is "substantial." The videotape here (1) was not made as contemporaneously as were the confessions in *Green* and *Chambers*; (2) was less of a statement against interest, because Simmons did not directly confess to the crime and may have had ulterior motives to create the tape; and (3) unlike the most important factor in *Green*, the prosecution did not introduce the videotape as evidence during trial. Additionally, while it is true that evidence of Simmons's remorse was important to the jury's consideration of mitigating factors, the videotape was not the sole avenue he had to provide such evidence. Simmons chose not to testify at the sentencing hearing, at which time he could have expressed his remorse in person. Introducing the videotape without testifying would have allowed Simmons to show that he felt remorse without the ability to cross-examine him.

Additionally, the Supreme Court's decisions in *Eddings* and *Lockett* do not provide Simmons a path to relief. The Supreme Court has held that it is "clear" and "well established" that the "sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings*, 455 U.S. at 114). The *Lockett/Eddings* line of cases, however, deals with the exclusion of specific types

of evidence rather than specific items in evidence.  In *Lockett*, the Supreme Court struck down Ohio's death penalty statute because it permitted the sentencer to consider only three mitigating circumstances.  438 U.S. at 607–08. Likewise in *Eddings*, the Supreme Court reversed the petitioner's death sentence because the trial judge refused to admit entire areas of mitigating evidence: there, evidence relating to the circumstances of the petitioner's "unhappy upbringing and emotional disturbance."  455 U.S. at 109, 113–15. Here, the trial court did not disallow evidence that Simmons was remorseful for his actions; instead, it excluded a particular item in which Simmons expressed remorse because the court found it unreliable hearsay.  Therefore, Simmons cannot accurately claim that the jury was deprived of considering "as a mitigating factor, any aspect of [his] character or record [or] any of the circumstances of the offense."  *Lockett*, 438 U.S. at 604–05.

We do not, and cannot, today decide whether the videotape should have been admitted as evidence during the sentencing hearing under Mississippi law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Instead, we can only decide whether the exclusion of the videotape was an unreasonable determination in light of clearly established federal law. Here, the facts of this case are easily distinct from the "unique" set of circumstances faced by the Supreme Court in *Green* and do not involve a categorical exclusion of mitigating evidence as in *Lockett* and *Eddings*.  Because the videotape's exclusion was not such an egregious evidentiary error so as to deny Simmons a fair sentencing hearing, we affirm the district court's denial of habeas on this ground.

## IV. CONCLUSION

No. 08-70048

We find that neither of the two grounds of error that Simmons has presented here entitle him to habeas relief.  Therefore, we affirm the district court's denial of Simmons's habeas petition.

AFFIRMED.

No. 08-70048

EMILIO M. GARZA, Circuit Judge, dissenting:

I agree with the majority that the State presented no evidence that could have supported applying the "great risk of death to many people" aggravating circumstance, and that the jury therefore should not have been instructed that it could weigh that aggravating circumstance in its decision to impose the death penalty. I also agree that this case would be unproblematic if the jury had been instructed that the only potentially applicable aggravating circumstance was that the petitioner ("Simmons") committed the murder for pecuniary gain. The only question, then, is whether the inclusion of the "great risk of death to many people" instruction was harmless. I cannot say with any confidence that it was. *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995) ("[W]hen a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief."). Accordingly, I dissent.

A trial court's submission of an invalid aggravating factor in a capital case is harmless "(a) if the sentence would have been the same had the unconstitutional aggravator never been submitted to the jury, or (b) if the sentence would have been the same had the . . . aggravating circumstance been properly defined in the jury instructions." *Nixon v. Epps*, 405 F.3d 318, 330 (5th Cir. 2005) (citing *Billiot v. Puckett*, 135 F.3d 311, 319 (5th Cir. 1998)). We will not consider submission of the aggravator sufficiently harmful to warrant habeas relief unless the factor "can be said to have had a 'substantial and injurious effect on the verdict reached by the jury.'" *Id.* at 329 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). There must be "'*more* than a mere reasonable possibility that [the improper aggravating circumstance] contributed to the verdict. It must have had *substantial* effect or influence in determining the verdict.'" *Id.* at 330 (quoting *Billiot*, 135 F.3d at 318). "[I]f, after evaluating the claim in light of the entire record, our minds are in 'virtual equipoise as to the harmlessness' of the error, 'we must conclude that it was harmful.'" *Id.*

No. 08-70048

(quoting *Billiot*, 135 F.3d at 318); *see O'Neal*, 513 U.S. at 435.  If we are in "grave doubt" about the effect of the error, we cannot deny relief on the ground that the error was harmless.  *O'Neal*, 513 U.S. at 435-37.

The trial court's erroneous instruction alone does not give us much indication of how much weight the jury may have given the risk of death to others.  The State, however, placed significant emphasis on that factor during closing argument.  Specifically, the State's argument to the jury at sentencing went into significantly more detail regarding what the jury might consider under "great risk of death to many people," focusing the jury's attention on Charlene Leaser's predicament.  Its discussion of aggravating circumstances began as follows:

> Aggravating, why he should receive [the death penalty]; mitigating, why he shouldn't.  Aggravating circumstance in this case, number one, is we submit to you he created a great risk of harm or death. Think of what was in that box for about six or seven hours.  Think of what was going to happen to her.  Think of what they consciously did to Jeffrey Wolfe, knowing they were going to have to get rid of everything, every piece of evidence including the body.

Simmons then objected to the argument as unsupported by the evidence.  The objection was overruled.  The State continued:

> Where does this all lead?  What was he going to do with the eyewitness to this crime?  What do you think was happening?

> Common sense.  You have heard all the evidence.  Based on everything you heard, I think it is reasonable to infer, to believe based on everything else, that this was going to happen to her.  So, that's submitted to you.  That's submitted to you because we think that was going to happen.  I think you think it was going to happen. You know it was going to happen.

This argument went well beyond the proper bounds of the "great risk of death to many people" aggravating factor, urging the jury to sentence Simmons to death based on facts that were not entitled to aggravating weight.  After

30

broadening its discussion to include the pecuniary gain aggravating circumstance, the State concluded by again referring to the treatment of Leaser and again suggesting that that treatment was appropriate for consideration as aggravating evidence:

> Unanimously find the aggravating circumstances, pecuniary gain, great risk of harm to many people. Think about Brooke. You go here and you say those circumstances outweigh the mitigating. Those mitigating circumstances do not outweigh. And I ask you to return a penalty of death in this case. If it's not imposed and the circumstances warrant it, it's no penalty at all.

It is not difficult to discern the State's argument. Its discussion of aggravation both opened and closed with emphasis on Simmons's actions towards Leaser, and the State discussed the "great risk of death to many" aggravator extensively. The State repeatedly urged the jury to place aggravating weight on Simmons's treatment of Leaser and, in particular, the probability that he would have eventually killed her.

I agree with the majority that it is appropriate to consider, as one factor in our analysis, whether evidence that was given aggravating weight under an improperly admitted factor would have been admissible even in the absence of that factor. But I cannot agree that, simply because the brutal details of Simmons's treatment of Leaser were admissible, the erroneous instruction was harmless. The majority suggests that this case is not meaningfully distinguishable from *Nixon v. Epps*, in which we found an erroneously charged aggravating circumstance harmless in light of the extensive "brutal details" on which the jury could have based a sentence of death. 405 F.3d at 331. But the jury in *Nixon* had been instructed that it could consider as an aggravating circumstance that the capital offense was especially heinous, atrocious or cruel. *Id.*; *see* MISS. CODE ANN. § 99-19-101(5)(h). In other words, the jury was expressly permitted to give aggravating weight to the brutal details of the crime.

31

As the Mississippi Supreme Court has explained, though, a jury instructed only as to the pecuniary gain aggravator, as this jury should have been, has "no way under the instructions to base their sentence of death on any argument that the crime was especially heinous." *Turner v. State*, 732 So. 2d 937, 956 (Miss. 1999) (en banc) (internal quotation marks omitted). Similarly, a jury instructed only as to pecuniary gain could not base the sentence of death on the great risk of death to many people. Even assuming that the majority is correct that Simmons's brutal treatment of Leaser is relevant to establishing the pecuniary gain aggravator, it is relevant only insofar as it supports the inference of a pecuniary motive. Simmons's brutality to Leaser, any risk he created to her, and any intent to eventually kill her could not have been given aggravating weight in their own right.

It is entirely possible that the jury, properly instructed and acting within the confines of those instructions, would have imposed the death penalty. Certainly, Mississippi courts have sentenced others to death in cases where pecuniary gain was the only aggravating circumstance. *See, e.g.*, *Turner v. State*, 953 So. 2d 1063, 1076 (2007) (en banc); *Byrom v. State*, 863 So. 2d 836, 881-82 (Miss. 2003) (en banc). This jury, unfortunately, never had the opportunity to decide whether the pecuniary gain aggravating circumstance alone outweighed any mitigating circumstances. Making matters worse, the State aggressively emphasized the risk Simmons posed to Leaser and urged the jury to consider that risk under the improperly charged factor. In light of the record as a whole, I cannot say with any confidence that the sentence was not substantially and injuriously influenced by the submission of that improper aggravating circumstance. I therefore respectfully DISSENT.